# Exhibit 6



Financial Industry Regulatory Authority

Terri L. Reicher
Associate Vice President
Associate General Counsel
Telephone (202) 728-8967
FAX (202) 728-8894
Terri.Reicher@finra.org

April 16, 2018

VIA Email

Richard Berry
Executive Vice President and Director
FINRA Office of Dispute Resolution
165 Broadway
New York, NY 10006

Re: *Scottsdale Capital Advisors, Inc. v. Eric Miller;*
FINRA Office of Dispute Resolution, Arbitration Case No. 17-01765

Dear Mr. Berry:

This office represents FINRA, and we are responding to the third-party subpoena for hearing testimony and documents in the above-referenced arbitration, which we received on April 5, 2018. Both the testimony and documents topics request production of information relating to communications between FINRA and Eric Miller, and any actions that FINRA has taken in response to such communications.

FINRA objects to this subpoena in this entirety, and will not be producing any documents or witnesses in response thereto. FINRA notes that Claimant served an identical subpoena on FINRA in February 2018, seeking the same witness and documents for pre-hrearing discovery. FINRA objected, and this Panel denied Claimant's motion to compel. Only the timing of the testimony and document production have changed; FINRA's objections have not, for the reasons set forth below.

1. **FINRA Previously Produced Responsive Documents to Claimant**

Until recently, FINRA was a defendant in a lawsuit captioned *John J. Hurry, et al. v. Financial Industry Regulatory Authority, Inc.*, Case No. 14-cv-02490-PHX-ROS, pending in the United States District Court for the District of Arizona. Plaintiff John Hurry was a principal of claimant Scottsdale Capital Advisors, and was represented by the same counsel who represents Scottsdale in this arbitration. The court dismissed the bulk of the Hurrys' lawsuit on in 2016, and the remainder of the lawsuit, with prejudice, on March 29, 2018. A copy of the court's recent dismissal is attached.

Investor protection. Market integrity.    1735 K Street, NW    t 202 728 8000
Washington, DC    www.finra.org
20006-1506

FINRA produced in discovery in the federal lawsuit copies of communications received from respondent Eric Miller, and plaintiffs deposed Mr. Miller on his communications with FINRA, which discovery is subject to a confidentiality order in the litigation. FINRA has already agreed to permit Claimant to use these communications

FINRA therefore objects to the subpoena because the responsive communications have already been produced.

## 2. FINRA Objects To Production of FINRA Internal Documents

FINRA objects to the category of the subpoena that requests production of documents relating to any "actions that [FINRA] took as a result of YOUR COMMUNICATIONS with MILLER relating to SCOTTSDALE."

FINRA has continuing regulatory authority over Scottsdale, and to the extent that FINRA actions are not reflected in a FINRA disciplinary action that has been initiated against Scottsdale, documents reflecting such regulatory actions are confidential and protected by privilege. Please note that FINRA also objects to producing any staff work product and internal documents that may exist in this file pursuant to the investigative file privilege, which is discussed below.

Exam Reports and Investigative Files

FINRA objects to testimony and production of documents relating to analyses, opinions or evaluations prepared by FINRA employees, customer complaints, and documents reflecting District Committee or Board of Governors considerations and deliberations, which are protected by the investigatory file privilege. The investigatory file privilege was specifically intended to apply to actions to enforce the securities laws. H. Rep. No. 1497 at 11, 89th Cong., 2d Sess. (1966). The purpose of the investigatory file privilege, also known as the law enforcement privilege, is to "prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise prevent interference with an investigation." *In Re Dept. of Investigation*, 856 F.2d 481, 484 (2d Cir. 1988). The investigatory file privilege has long been recognized with regard to the Securities and Exchange Commission files. In *Ross v. Bolton*, 106 F.R.D. 22 (S.D.N.Y. 1985), the protection against disclosure of investigatory records was extended to NASD (now known as FINRA) investigatory records:

> There is strong public interest in maintaining the integrity of effective industry self-regulation. This interest would clearly be undermined by making NASD files fair game for any of the thousands of private securities fraud litigants across the country who wish to shortcut their own discovery efforts and instead to reap the benefits of the Association's ongoing, statutorily governed work. 15 U.S.C. §§ 78o 3, 78s. The public interest in maintaining certain functions and relationships has been a primary factor in limiting discovery absent a formal privilege.

*See also, Fiero Brothers v. Mishkin,* No. 95-08203 JLG, 1999 WL 1747410 (S.D.N.Y. Dec. 8, 1999) ("The "investigatory privilege" is a qualified common law privilege protecting civil as well as criminal law-enforcement investigatory files from civil discovery. . . . The privilege has been extended to quasi-governmental or non-governmental entities, like NASD [now known as FINRA], entrusted with the enforcement of rules of conduct and procedure promulgated by self-regulating industries.")

FINRA is the primary examining authority for the over-the-counter securities industry in the United States and in that capacity conducts investigations of FINRA member firms regarding their financial condition and compliance with securities laws and regulations. FINRA does not have the authority to issue administrative or judicial subpoenas to aid FINRA in obtaining information for its investigations. As a result, FINRA's investigative efforts are largely dependent upon information that is supplied voluntarily by customers, member firms and others. FINRA's quasi-public role has been acknowledged by the courts. *See, e.g., Partnership Exchange Securities Company v. NASD, Inc.,* 169 F.3d 606 (9th Cir. 1999); *Austin Municipal Securities, Inc., et al. v. NASD et al.,* 757 F.2d 676 (5th Cir. 1985); and *First Jersey Securities, Inc., et al. v. Bergen,* 605 F.2d 690 (3d Cir. 1979), *cert. denied,* 444 U.S. 1074 (1980).

In addition to FINRA's internal actions being privileged, they are also irrelevant to the case before the Panel. Whether Mr. Miller communicated with FINRA is not in doubt; he did. The content of the communications are not in doubt; FINRA produced them over a year ago to Scottsdale's counsel. What actions FINRA did or did not take, or considered taking or not taking, are not at issue in any case between Scottsdale and Mr. Miller. The only action where FINRA's actions could possibly be relevant was in the Hurry's lawsuit against FINRA, which was dismissed.

### 3. The Panel Lacks Jurisdiction Over FINRA

While FINRA is registered to do business in Arizona, its registration does not subject it to Arizona (or an arbitral tribunal relying on Arizona's subpoena authority) jurisdiction for purposes of subpoenas. A.R.S. 12-3017. The arbitration panel has the same personal jurisdiction over FINRA as would an Arizona court. See A.R.S. 12-3017. Arizona's long-arm statute extends personal jurisdiction "to the maximum extent permitted by the . . . Constitution of the United States." Arizona Rule of Civil Procedure 4.2(a). Thus, the personal jurisdiction inquiry collapses into an analysis of due process. Due process requires that a non-resident defendant have certain minimum contacts with the forum state so that the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945). Personal jurisdiction over a non-resident defendant may be either specific or general. Here, neither specific nor general jurisdiction exists.

A court may only exercise specific jurisdiction when a non-resident defendant has "purposely directed his activities at residents of the forum . . . and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp. v.*

*Rudzewicz*, 471 U.S. 462, 472 (1985). The arbitration between Scottsdale and Mr. Miller does not arise out of FINRA's activities in Arizona. Accordingly, the arbitration panel cannot exercise specific jurisdiction over FINRA.

A court may only exercise general jurisdiction when a non-resident defendant's contacts with the forum state "are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Daimler AG v. Bauman*, 134 S. Ct. 746, 761 (2014) (emphasis added). For a corporation the "paradigm all-purpose forums" for general jurisdiction are its (1) "formal place of incorporation," and (2) "principal place of business." *Daimler*, 134 S. Ct. at 760-61. Only in a truly "exceptional" case will a foreign corporation be "at home" in a place where it is not incorporated or headquartered. See *Daimler*, 134 S. Ct. at 761 n.19. Indeed, the general jurisdiction standard is so exacting that Justice Sotomayor recently and pointedly acknowledged "it is virtually inconceivable" that "large multistate or multinational corporations" "will ever be subject to general jurisdiction in any location other than their principal places of business or of incorporation," regardless of whether they "have continuous and systematic contacts within the United States." *BNSF Railway Co. v. Tyrell*, 137 S. Ct. 1549, 1560 (2017) (Sotomayor, J., dissenting) (emphasis added).

FINRA is a Delaware corporation with its principal place of business in Washington, D.C. It is not "at home" in Arizona, and the arbitration panel therefore cannot exercise general jurisdiction over FINRA.

\*\*\*\*\*\*\*\*

Pursuant to FINRA Rule 13512(e), these objections are being sent to the Office of the Dispute Resolution Director.

FINRA makes the above objections based solely on its current knowledge, understanding, and belief as to the facts available to it as of the date the above objections are made. FINRA reserves the right at any time to supplement, revise, correct, add to, or clarify its responses and objections. If you have any questions, please feel free to contact me.

Very truly yours,

*Terri L. Reicher*

Terri L Reicher


cc: Jordan Susman, Esq. (jsusman@hmafirm.com)
     Glenn R. Hotchkiss, Esq. (ghotchkiss@buchalter.com)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| John J. Hurry, et al., | No. CV-14-02490-PHX-ROS |
| Plaintiffs, | **ORDER** |
| v. | |
| Financial Industry Regulatory Authority Incorporated, et al., | |
| Defendantss. | |

Defendant Financial Industry Regulatory Authority Inc. ("FINRA") seeks summary judgment on Plaintiffs' claims for defamation and false light. Plaintiffs have no admissible evidence a FINRA employee made the statements that serve as the basis for those claims. FINRA is entitled to summary judgment.

## BACKGROUND

Unless otherwise indicated, the following facts are undisputed. Plaintiffs John and Justine Hurry own and operate a large number of businesses, including Scottsdale Capital Advisors Corporation ("SCA"). SCA is a registered broker-dealer subject to regulation by FINRA. Plaintiffs say in 2012 FINRA decided "to pin some charge, any charge," on Plaintiffs and their businesses. (Doc. 176 at 4). In pursuit of that goal, FINRA conducted a surprise inspection of SCA in November 2012. The next month, FINRA allegedly convinced the Nevada Secretary of State to issue subpoenas seeking information regarding Plaintiffs' businesses. And in June 2013, FINRA interviewed Plaintiffs' employees, hoping "to obtain evidence of wrongdoing." (Doc. 176 at 5). Those actions

did not uncover evidence of misconduct and Plaintiffs believe someone at FINRA decided to pursue illegitimate means to hurt Plaintiffs and their businesses.

According to Plaintiffs, an unidentified FINRA employee began working with William Meagher, a financial reporter. That unidentified FINRA employee allegedly provided documents to Meagher and made a number of false statements about Plaintiffs and their businesses. Plaintiffs' defamation and false light claims are based on statements appearing in four articles Meagher published in 2013 and 2014.

**A. September 17, 2013 Article**

Meagher's first article was published on September 17, 2013. That article was titled "Finra targets a dozen offshore firms suspecting [sic] of trading in pump-and-dumps."[1] (Doc. 173-1 at 67). The article claimed FINRA recently "asked the Securities and Exchange Commission to investigate at least a dozen offshore banks and brokerage houses" that had engaged in "suspicious trading." The article stated Meagher had reviewed "Fraud Surveillance" reports generated by FINRA. Plaintiffs contend those reports were confidential and FINRA was only supposed to give them to the SEC. Thus, Plaintiffs believe Meagher's review of the reports shows someone at FINRA provided the reports to Meagher.

As recounted in his article, the reports stated an individual named Philip Kueber had opened a "trading account" with SCA. In the past, Mr. Kueber had "been referred to the SEC by Finra at least eight times for his alleged involvement with pump-and-dump schemes." (Doc. 173-1 at 68). Both the SEC and FINRA "declined to comment for [the] story." Plaintiffs do not identify any statements in this article as defamatory or as supporting their false light claim. Instead, Plaintiffs cite this article solely as evidence that Meagher had a source at FINRA who had provided him information.

---

[1] The phrase "pump and dump" is a common term in the securities industry referring to schemes whereby individuals obtain stock, "artificially inflate its value, [and then] sell it for significant profit." *United States v. Jenkins*, 633 F.3d 788, 793 (9th Cir. 2011).

### B. December 6, 2013 Article

After publishing the first article, Meagher began researching another article touching on SCA's activities. Meagher had somehow learned FINRA was investigating SCA's connections to a pump-and-dump scheme involving a company named Biozoom. In mid-November 2013, Meagher left a voicemail for Michelle Ong, a Director in the Media and External Communication department of FINRA, seeking a comment regarding FINRA's SCA/Biozoom investigation. On November 19, Ong sent Meagher an email stating "we have not provided . . . information to you and have [no comment] for you on it." (Doc. 173-1 at 124). Meagher responded via email, stating his new article had "nothing to do with the internal Finra reports" his September 17 article had mentioned. Meagher's email also stated Ong was "certainly correct" that he "did not learn about" FINRA's SCA/Biozoom investigation from anyone at FINRA. Instead, Meagher stated he had "spoken with someone who has knowledge of the investigation."

On December 6, 2013, Meagher published his article regarding SCA and Biozoom. That article was titled "FBI, securities officials investigating Scottsdale Capital, Alpine Securities, sources say." The article claimed the FBI, SEC, and FINRA had opened investigations into SCA's involvement in the trading of Biozoom stock. (Doc. 173-1 at 80). Those investigations were based on recent events where Biozoom's stock had risen from a share price of $1.10 to as high as $4.50. The price later plummeted to $0.13, causing investors in Biozoom to lose $300 million. The article stated the SEC had recently filed a lawsuit and "obtained an emergency order from the U.S. District Court in Manhattan, freezing almost $16 million in cash in U.S. brokerage accounts" connected to Biozoom. (Doc. 173-1 at 79). The article then went into detail regarding SCA's involvement with the Biozoom trading.

According to the article, six individuals had opened accounts at SCA, claiming they owned Biozoom shares. Those individuals had opened their accounts the same week and each claimed to live in Buenos Aires. The handwriting on the six account applications was the same. Based on a "person with knowledge of the investigations"

into SCA and Biozoom, the six individuals were "straw men for whoever is behind this whole thing." The source was also quoted as stating the six individuals had "enjoyed perks that were not available to other [SCA] clients" and there had been "several red flags" that should have prompted SCA to take action but SCA had failed to do so.

### C. March 20, 2014 Article

On March 20, 2014, Meagher wrote a follow-up to his December 6 article. That article stated the SEC planned to pursue default judgment in the "Biozoom Inc. pump-and-dump case" it had filed in New York. (Doc. 173-1 at 126). The article then recounted the previous allegations that six individuals involved in the Biozoom trading had opened accounts with SCA and SCA had provided them with "perks that were not available to other clients." The article claimed FINRA and the FBI were "investigating the involvement of [SCA]" in the Biozoom matter. And the SEC as well as FINRA had demanded SCA "turn over all personal notes regarding Biozoom" and not destroy any Biozoom records. (Doc. 173-1 at 128). The SEC, FINRA, and SCA had refused to comment and the article was based on information provided by "a person with knowledge of the probe."

### D. April 16, 2014 Article

On April 16, 2014, Meagher published the final relevant article. That article was titled "Finra focusing on money-laundering violations." (Doc. 173-1 at 130). That article began by recounting the details of a visit by FINRA at SCA's offices in March 2014. During that visit, FINRA had "asked for files relating to overseas clients and omnibus accounts, which are owned in the names of other brokerage firms." The article seemed to link that visit to a fine imposed against an unrelated brokerage firm for its "alleged violations of anti-money laundering regulations." (Doc. 173-1 at 130). The article explained FINRA had recently begun pursuing possible money laundering violations in a more systematic manner. The article concluded by recounting some of the information contained in previous articles regarding the investigation into SCA and Biozoom. (Doc. 173-1 at 133).

After publication of these four articles, and based on other actions by FINRA allegedly aimed at harming Plaintiffs and their businesses, Plaintiffs filed the present suit. The original and amended complaints contained a large number of parties, allegations, and claims that are no longer relevant. The only claims still pending are against FINRA for defamation and false light.

While Plaintiffs' remaining claims are based on Meagher's articles, Plaintiffs have never clearly identified each statement in those articles on which their claims are based. Thus, it is difficult to speak with precision regarding the statements at issue. Based on the parties' filings, however, it appears Plaintiffs base their claims only on the following statements in the December, March, and April articles: 1) the SEC, FINRA, and the FBI were investigating SCA; 2) the six individuals who had opened accounts at SCA were granted special perks; and 3) SCA had ignored "red flags" regarding the Biozoom trading.[2] During discovery, FINRA identified Meagher's source for most of these statements.

During his deposition, Eric Miller, a former SCA employee, admitted he had been Meagher's source for almost all of the statements regarding SCA's involvement with Biozoom. Miller admitted telling Meagher: 1) the SEC and FINRA were investigating SCA; 2) the six individuals had received special perks; and 3) SCA had ignored red flags in the Biozoom trading. (Doc. 173-1 at 87-88). Of the statements on which Plaintiffs base their claim, the only statement Miller denied making was that the FBI was investigating SCA. (Doc. 173-1 at 85-88).

Despite Miller admitting he was Meagher's source for most of the relevant statements, Plaintiffs remained convinced someone at FINRA was behind Meagher's articles. Plaintiffs pursued discovery from FINRA but were unable to locate any

---

[2] Some of these statements appear to have been true and, as such, cannot be a proper basis for a defamation claim. *See Read v. Phoenix Newspapers, Inc.*, 819 P.2d 939, 941 (Ariz. 1991) ("Substantial truth is an absolute defense to a defamation action in Arizona."). For present purposes, however, the Court will assume these statements were false and address whether Plaintiffs have sufficient evidence to proceed to trial under that assumption.

evidence of a FINRA employee making the relevant statements to Meagher. That lack of evidence prompted FINRA to file its motion for summary judgment. That motion's primary focus is Plaintiffs' lack of evidence. Plaintiffs' opposition does not point to any evidence of a FINRA employee making the statements but Plaintiffs believe they are still entitled to argue their claims at trial.

## ANALYSIS

### I. Defeating Summary Judgment Requires More than a Metaphysical Doubt

FINRA "has both the initial burden of production and the ultimate burden of persuasion on [its] motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). As the party who will not bear the burden of proof at trial, FINRA can carry its burden of production by "produc[ing] evidence negating an essential element of [Plaintiffs' claims] or show[ing] that [Plaintiffs do] not have enough evidence of an essential element to carry [their] ultimate burden of persuasion at trial." *Id.* Assuming FINRA carries its burden of production, it must then meet its burden of persuasion by establishing "there is no genuine issue of material fact." *Id.*

FINRA attempts to meet its burden of production by arguing Plaintiffs have no evidence a FINRA employee published the statements that are the basis for Plaintiffs' claims. Under this approach, FINRA need only "'show[]'—that is, point[] out through argument—the absence of evidence to support [Plaintiffs'] claim[s]."[3] *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000). If the Court concludes FINRA has presented credible arguments that Plaintiffs lack evidence supporting their claims, the burden will shift to Plaintiffs "to establish the existence of all elements

---

[3] FINRA is not required to present evidence establishing Plaintiffs lack of evidence supporting their claims. As explained by the Ninth Circuit, "if the nonmoving party bears the burden of proof on an issue at trial, the moving party need not produce affirmative evidence of an absence of fact to satisfy its burden. The moving party may simply point to the absence of evidence to support the nonmoving party's case." *In re Brazier Forest Prod., Inc.*, 921 F.2d 221, 223 (9th Cir. 1990). In other words, "[t]he moving party must show the absence of a genuine issue concerning any material fact, but it need not produce evidence to do so; it may merely point out to the court the absence of evidence." *Maffei v. N. Ins. Co. of New York*, 12 F.3d 892, 899 (9th Cir. 1993).

essential to their case on which they will bear the burden of proof at trial." *In re Brazier Forest Prod., Inc.*, 921 F.2d 221, 223 (9th Cir. 1990).

Once the burden is shifted to Plaintiffs they "must produce at least some significant probative evidence" supporting their claims. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Such evidence must be more than "[a] scintilla," more than "merely colorable," and cannot rest on speculation. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989); *United States Postal Serv. v. Ester*, 836 F.3d 1189, 1198 (9th Cir. 2016) (speculation not enough to defeat summary judgment). In short, Plaintiffs' evidence must do more than create "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Of particular importance in this case, it is not enough for Plaintiffs to claim they "will discredit [FINRA's] evidence at trial" or that "something can be developed at trial in the way of evidence to support [their] claims." *T.W. Elec.*, 809 F.2d at 630.

If FINRA shifts the burden to Plaintiffs, and Plaintiffs are unable to point to significant probative evidence, FINRA will have carried its burden of persuasion. Plaintiffs' lack of evidence will also mean FINRA has carried its burden of persuasion because there will be no "genuine dispute at to any material fact" and FINRA will be entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

**II. Plaintiffs Cite No Admissible Evidence Supporting Their Claims**

To prevail on their defamation or false light claims, Plaintiffs must have evidence a FINRA employee "published" the relevant statements to Meagher. *See Dube v. Likins*, 167 P.3d 93, 104 (Ariz. Ct. App. 2007) (defamation requires publication of statement). According to FINRA, Plaintiffs have "[n]o emails; no letters; no phone calls; no in-person communications" establishing a FINRA employee published the statements. Pointing to this alleged absence of evidence was sufficient to shift the burden to Plaintiffs to identify "significant probative evidence" that a FINRA employee did, in fact, publish the statements. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630

(9th Cir. 1987). Plaintiffs point to no such evidence.

Instead of direct evidence of communications between a FINRA employee and Meagher, Plaintiffs point to the September 17 article as establishing a sufficient basis on which a jury might "infer" a FINRA employee published the statements to Meagher. (Doc. 176 at 11). According to Plaintiffs, the September 17 article relied on confidential documents which Meagher must have received from FINRA.[4] Plaintiffs have never argued statements in the September 17 article constituted defamation or false light invasion of privacy. Thus, even assuming a FINRA employee gave the confidential documents to Meagher, that fact does not establish FINRA's liability on the present claims. Rather, that fact merely creates a theoretical possibility of other communications between a FINRA employee and Meagher. But a theoretical possibility cannot defeat summary judgment. That is especially true here where even Plaintiff's theoretical possibility is almost entirely negated by the undisputed evidence.

During his deposition, former-SCA employee Miller admitted he had been Meagher's source for the statements that the SEC and FINRA were investigating SCA, the six individuals had received special perks, and SCA had ignored red flags in the Biozoom trading. (Doc. 173-1 at 87-88). Given Miller's confession, Plaintiffs are forced to argue "journalists often have multiple sources" and there is no guarantee Miller was Meagher's sole source. In other words, Plaintiffs seem to believe the Court should conclude Miller and a FINRA employee might have published the exact same statements to Meagher. Baseless speculation is no substitute for evidence.

Speculating that something "could conceivably have occurred . . . does not give rise to a reasonable inference that it did in fact occur." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011). To avoid summary judgment, Plaintiffs needed to point to "non-speculative evidence of specific facts, not

---

[4] Plaintiffs admit Meagher could have received the documents from FINRA or the SEC but argue it is unlikely the SEC was the source. Plaintiffs do not explain why it is implausible the documents came from the SEC, which means the argument is mere speculation.

sweeping conclusory allegations." *Id.* Plaintiffs' musings that an unidentified FINRA employee and Miller may have made the same statements to Meagher are not remotely close to a valid basis on which to proceed to trial. *See United States v. Castellanos-Garcia*, 270 F.3d 773, 776 (9th Cir. 2001) ("A trial is not the place to explore the limits of imaginative musings; it is a place to decide facts based on evidence."). Plaintiffs cannot avoid summary judgment regarding any of the statements on which Miller admitted he was the source.

The only relevant statements which Miller denied making was that the FBI was investigating SCA. (Doc. 173-1 at 85-88). That denial did not relieve Plaintiffs of their obligation to point to evidence a FINRA employee made the statement. Even in connection with this statement, Plaintiffs have no evidence. Plaintiffs do not point to an email, instant message, text, letter, phone-call, or in-person conversation where a FINRA employee made this statement (or any other statement) to Meagher. Plaintiffs claim a jury might infer a FINRA employee made the statement but a jury is not free to draw inferences based on nothing. Plaintiffs are entitled to reasonable inferences, not all possible inferences. *Cf. Poppell v. City of San Diego*, 149 F.3d 951, 954 (9th Cir. 1998) (discussing permissible inferences and noting "mere speculation" must not be "allowed to do duty for probative facts"). Plainly, a jury is not allowed to speculate and jury instructions clearly state the rule.[5] With no evidentiary basis for a jury to infer a FINRA employee told Meagher the FBI was investigating SCA, FINRA is entitled to summary judgment.[6]

---

[5] *See* Ninth Circuit Manual of Model Civil Jury Instructions 1.15 (stating a jury must "decide [the] case based only on the evidence received in the case"); 5.1 (stating damages "must be based upon evidence and not upon speculation, guesswork or conjecture").

[6] A fundamental challenge for Plaintiffs is that their claims are based on false information. Unlike true information peculiarly within FINRA's possession, false information could have originated with anyone. Assuming the FBI was not, in fact, investigating SCA, the claim that the FBI was investigating SCA could have come from anywhere, including Meagher's own imagination. Absent actual evidence a FINRA employee made the statement, there is no plausible way to attribute the statement to FINRA.

The complete absence of evidence supporting Plaintiffs' claims, coupled with the affirmative evidence showing Miller was responsible for most of the statements, makes the foregoing analysis straightforward. In last-ditch efforts to obscure the absence of any evidence supporting their claims, Plaintiffs make a variety of arguments that are not worthy of substantial discussion. For example, Plaintiffs claim they have evidence a FINRA employee lied during her deposition regarding the prevalence of leaks at FINRA. (Doc. 176 at 8). But even assuming Plaintiffs are correct that the FINRA employee lied at her deposition on that topic, that untruthfulness is not evidence a FINRA employee made the relevant statements to Meagher. Creating a credibility dispute regarding a witness on a collateral matter is no substitute for evidence supporting Plaintiffs' claims.

Plaintiffs also argue FINRA conducted a shoddy internal investigation regarding employee communications with Meagher. Plaintiffs seem to believe that if FINRA had conducted a more-acceptable-to-them investigation, it would have uncovered the evidence Plaintiffs need to support their claims. Plaintiffs were allowed to pursue lengthy discovery and FINRA's allegedly shoddy internal investigation cannot be substituted for affirmative evidence supporting Plaintiffs' claims. To the extent Plaintiffs did not receive the information they sought from FINRA during discovery, they should have sought assistance by following the Court's discovery dispute procedures. Plaintiffs did not do so and the alleged inadequacy of FINRA's internal investigation is irrelevant.

Plaintiffs have no evidence supporting their claims and FINRA is entitled to summary judgment on the defamation and false light claims.

Accordingly,

**IT IS ORDERED** the Motion for Summary Judgment (Doc. 172) is **GRANTED**.

**IT IS FURTHER ORDERED** the Clerk of Court shall enter judgment in favor of Defendants and against Plaintiffs on all counts.

Dated this 29th day of March, 2018.

Honorable Roslyn O. Silver
Senior United States District Judge