# EXHIBIT B

MICHAEL K. JEANES
Clerk of the Superior Court
By Anna Valenzuela, Deputy
Date 04/04/2017 Time 16:44:48
Description                    Amount
--------- CASE# CV2017-005018 ---------
CIVIL NEW COMPLAINT            319.00

TOTAL AMOUNT                   319.00
        Receipt# 25848361

1 | Joseph G. Adams (#018210)
  | Carlie Tovrea (#029709)
2 | SNELL & WILMER L.L.P.
  | One Arizona Center
3 | 400 East Van Buren, Suite 1900
  | Phoenix, Arizona 85004-2202
4 | Telephone:  602.382.6000
  | Facsimile:  602.382.6070
5 | E-Mail: jgadams@swlaw.com
  |         ctovrea@swlaw.com
6 |
  | Charles J. Harder (*pro hac vice* to be filed)
7 | Dilan A. Esper (*pro hac vice* to be filed)
  | Jordan Susman (*pro hac vice* to be filed)
8 | HARDER MIRELL & ABRAMS L.L.P.
  | 132 S. Rodeo Drive, Fourth Floor
9 | Beverly Hills, California 90067
  | Telephone:  (424) 203-1600
10| E-mail:  CHarder@hmafirm.com
  |          DEsper@hmafirm.com
11|          JSusman@hmafirm.com
12| Attorneys for Plaintiff
  | Scottsdale Capital Advisors
13|

14 |            IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

15 |                 IN AND FOR THE COUNTY OF MARICOPA

16 |

17 | SCOTTSDALE CAPITAL ADVISORS          Case No. CV2017-005018

18 | CORP., an Arizona corporation,        **COMPLAINT**

19 |              Plaintiff,

20 |       v.

21 | ERIC MILLER and DEBRA FREIDNASH,
   | husband and wife,
22 |
   |              Defendants.
23 |

24 |

25 |

26 |

Plaintiff Scottsdale Capital Advisors Corp., for its Complaint against Eric Miller and Debra Freidnash, alleges as follows:

### INTRODUCTION

1.      Plaintiff Scottsdale Capital Advisors Corp. ("SCA") is a well-regarded and very successful securities broker dealer.

2.      Defendant Eric Miller ("Miller") is a former employee of SCA.

3.      This action arises from Miller's two-pronged scheme to destroy SCA and abscond with its clients using SCA's confidential information.

4.      While still an employee of SCA, Miller divulged confidential information about SCA, and made false and defamatory statements of and concerning SCA, to the Financial Industry Regulatory Authority ("FINRA") and the financial press.

5.      Simultaneously, and in flagrant violation of numerous securities, banking, and privacy laws, Miller used private information about SCA's clients to try to obtain a job with a securities brokerage firm in Belize.

6.      By this action, SCA seeks to hold Miller liable for his misconduct that  has caused lasting and permanent harm to SCA.

### THE PARTIES

7.      Plaintiff Scottsdale Capital Advisors Corp. is, and at all pertinent times was, a corporation organized under the laws of the State of Arizona, with its principal place of business in Maricopa County, Arizona.

8.      Defendant Eric Miller is an individual who resides in Maricopa County, Arizona.

9.      Defendant Debra Freidnash is also an individual who resides in Maricopa County, Arizona.

10.     On information and belief, Eric Miller and Debra Freidnash are a married couple.  On information and belief, Eric Miller's individual conduct that gives rise to this

1   action was undertaken on behalf of, and for the benefit of, the marital community.

2   **JURISDICTION AND VENUE**

3   11.   This Court has jurisdiction of this matter under Ariz. Const. Art. VI, § 14

4   and A.R.S. § 12-123.

5   12.   Venue in Maricopa County is proper under A.R.S. § 12-401.

6   **FACTS COMMON TO ALL CAUSES OF ACTION**

7   **Background Information About SCA**

8   13.   SCA was founded in 2002 as a full service broker-dealer focused on serving

9   the microcap securities market, often referred to as the over-the-counter market. In that

10  time, SCA has grown to be one of the largest and most dominant firms in the clearing

11  microcap securities market in the United States.

12  14.   In the course of their employment, employees at SCA are exposed to, and

13  entrusted with, information that is commercially valuable to SCA and not generally

14  known or readily ascertainable in the broker-dealer securities industry or the public at

15  large. In addition, SCA employees are privy to information regarding SCA's business

16  practices and clients that is confidential even though it may not rise to the level of trade

17  secret information, as well as private financial information obtained from SCA's

18  customers.

19  15.   As a consequence, SCA requires its employees to enter into written

20  agreements to protect SCA's trade secrets and the various forms of confidential

21  information that SCA employes come in contact with. SCA also has, in compliance with

22  SEC regulations, promulgated an extensive financial privacy policy to protect its

23  customers' private information, and requires its employees to comply with this policy.

24  **Miller Agrees Not To Disclose Confidential Information**

25  16.   Defendant Eric Miller was employed at SCA as a stock broker between

26  approximately February 2012 and September 2014, and again between approximately

-3-

October 2015 and March 2016.

17.     Attached hereto as Exhibit 1 and incorporated by this reference is a true and correct copy of an Employee Nondisclosure & Computer Use Agreement ("NDA") between Miller and SCA that Miller executed on or about January 27, 2012.

18.     Attached hereto as Exhibit 2 and incorporated by this reference is a true and correct copy of a second NDA between Miller and SCA that Miller executed on or about October 5, 2015.  The first and second NDA (collectively, the "NDAs") contain identical verbiage.

19.     As acknowledged in the NDAs, Miller was exposed to SCA's "Confidential Information" in the performance of his job duties at SCA.

20.     The NDAs define Confidential Information as "information or material that is commercially valuable to Company [i.e., SCA] and not generally known or readily ascertainable in the industry," including without limitation "information concerning Company's business" and "information submitted by Company's customers."

21.     Per the NDAs, Miller agreed not to disclose Confidential Information to anyone outside of the SCA without SCA's prior written consent.  The NDAs further provide that "Employee's [i.e., Miller's] obligation to maintain the confidentiality and security of Confidential Information remains even after Employee's employment with Company ends."

**Miller Attempts to Destroy SCA By Sharing Confidential Information With And Making Defamatory Statements To FINRA And the Press**

22.     In or about mid-2013, while working at SCA, Miller contacted FINRA, a self-regulatory organization that acts under authority of the U.S. Securities and Exchange Commission to regulate broker-dealer firms registered under section 15 of the Exchange Act, ostensibly to report suspicious activities at SCA.  In fact, Miller contacted FINRA for the express purpose of destroying SCA.

23.     Over the course of several months, Miller spoke with employees at FINRA about SCA and on numerous occasions emailed information about SCA, including information about SCA's business practices and its clients, that was either confidential or false. Among other things, Miller divulged to FINRA the names of SCA clients, SCA's business methods for accepting orders from clients, and SCA's pricing schedules for charging clients.

24.     Miller encouraged FINRA to harass and intimidate SCA, and advised them on ways to do it, such as suggesting that FINRA review the text messages of SCA's employees and telling FINRA that it should promptly press forward with regulatory proceedings against SCA.  In addition, Miller encouraged FINRA to block a pending acquisition of another broker dealer named Wilson Davis by SCA's president John Hurry.

25.     In a further effort to harm SCA, in or about September 2013, Miller contacted a reporter at The Deal Pipeline, a financial news and information service whose readership includes a range of financial institutions and other key audiences in the financial services market.  Miller divulged to The Deal Pipeline confidential information about SCA's business practices and its clients that was confidential, including without limitation the names of SCA clients, SCA's business methods for accepting orders from clients, and SCA's fee structures, and Miller further made many false and defamatory statements to The Deal Pipeline of and concerning SCA.

**Miller Divulges Confidential Information to Try to Leverage a Job in Belize**

26.     In or about December 2013, after wrongfully divulging confidential and false information about SCA to FINRA and The Deal Pipeline, Miller contacted Unicorn International Securities LLC ("Unicorn") in Belize in an attempt to set up a lucrative position for himself as a broker-dealer.

27.     Between January and November 2014, Miller sent dozens of emails to Unicorn's compliance officer, many of which contained confidential information about

SCA's clients, including names, social security numbers, account numbers, and stocks owned.

28.     Although Miller did not obtain a position at Unicorn, it was not for his lack of trying.  Rather, in September 2014, Unicorn was indicted in the Eastern District of New York for conspiracy to commit securities fraud, tax fraud, and money laundering.

## COUNT ONE

### (Breach of Written Contract: Nondisclosure Agreement)

29.     Plaintiff incorporates by reference all of the preceding paragraphs as though fully restated herein.

30.     The NDAs, to which Miller agreed to be bound, constitute valid and enforceable contracts between SCA and Miller.

31.     Notwithstanding Miller's obligations under the NDAs, as described herein he knowingly and systematically disclosed Confidential Information to third parties.

32.     As a direct and proximate result of Miller's breaches of the NDAs, SCA has suffered and will continue to suffer irreparable harm and economic damages.

33.     Moreover, it was foreseeable that SCA would suffer damages if Miller disclosed SCA's Confidential Information to third parties.

34.     SCA is entitled to recover its reasonable attorneys' fees and costs pursuant to the NDAs, to which Miller agreed to be bound, and A.R.S. §§ 12-341 and 12-341.01(A).

## COUNT TWO

### (Breach of Implied Covenant of Good Faith and Fair Dealing:
### Nondisclosure Agreement)

35.     Plaintiff incorporates by reference all of the preceding paragraphs as though fully restated herein.

36.     Implicit in all contracts is the covenant of good faith and fair dealing that

imposes on each party a duty of good faith and fair dealing.

37.    Miller prevented SCA from receiving the benefits and entitlements that SCA reasonably expected to flow from the NDAs to which Miller agreed to be bound, thereby breaching the implied covenant of good faith and fair dealing existing in those contracts.

38.    As a direct and proximate result of Miller's breaches of the implied covenant of good faith and fair dealing, SCA has suffered and will continue to suffer irreparable harm and economic damages.

39.    This count arises out of contract.  Accordingly, Company is entitled to its costs and reasonable attorneys' fees under A.R.S. §§ 12-341 and 12-341.01(A).

## COUNT THREE

**(Breach of Written Contract: Registered Representative Agreement)**

40.    Plaintiff incorporates by reference all of the preceding paragraphs as though fully restated herein.

41.    Attached hereto as Exhibit 3 and incorporated by this reference is a true and correct copy of a Registered Representative Agreement ("RRA") between Miller and SCA that Miller executed in or about January 2012.

42.    The RRA defines Confidential Information as certain information disclosed to Miller as a consequence of his association with SCA and not generally known outside of SCA, including financial data and client information.

43.    Per the RRA, Miller agreed not to disclose Confidential Information without SCA's prior written consent.

44.    The RRA, to which Miller agreed to be bound, constitutes a valid and enforceable contract between SCA and Miller.

45.    Notwithstanding Miller's obligations under the RRA, as described herein he knowingly and systematically disclosed Confidential Information to third parties.

46.    As a direct and proximate result of Miller's breaches of the RRA, SCA has

suffered and will continue to suffer irreparable harm and economic damages.

47.     Moreover, it was foreseeable that SCA would suffer damages if Miller disclosed SCA's Confidential Information to third parties.

48.     SCA is entitled to recover its reasonable attorneys' fees and costs pursuant to the RRA, to which Miller agreed to be bound, and A.R.S. §§ 12-341 and 12-341.01(A).

## COUNT FOUR

### (Breach of Implied Covenant of Good Faith and Fair Dealing:

### Registered Representative Agreement)

49.     Plaintiff incorporates by reference all of the preceding paragraphs as though fully restated herein.

50.     Implicit in all contracts is the covenant of good faith and fair dealing that imposes on each party a duty of good faith and fair dealing.

51.     Miller prevented SCA from receiving the benefits and entitlements that SCA reasonably expected to flow from the RRA to which Miller agreed to be bound, thereby breaching the implied covenant of good faith and fair dealing existing in those contracts.

52.     As a direct and proximate result of Miller's breaches of the implied covenant of good faith and fair dealing, SCA has suffered and will continue to suffer irreparable harm and economic damages.

53.     This count arises out of contract. Accordingly, Company is entitled to its costs and reasonable attorneys' fees under A.R.S. §§ 12-341 and 12-341.01(A).

## COUNT FIVE

### (Violation of Arizona Trade Secret Act)

54.     Plaintiff incorporates by reference all of the preceding paragraphs as though fully restated herein.

55.     During the course of his relationship with SCA, Miller had access to SCA's confidential business information.

56.   At all relevant times, SCA undertook reasonable steps to safeguard its confidential business information.

57.   SCA's confidential business information constitutes "trade secrets" as the term is defined in A.R.S. § 44-401 because it is information:

- from which SCA derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

- that is the subject of efforts to maintain its secrecy that are reasonable under the circumstances.

58.   Pursuant to the contracts entered into by Miller, and under A.R.S. § 44-401 *et seq.*, Miller owed SCA a duty to protect those trade secrets to which he had access.

59.   Miller violated those duties by knowingly misappropriating and wrongfully using SCA's trade secrets for his own benefit, including *inter alia*:

- information concerning SCA's internal policies and pricing strategies;

- information concerning SCA's client lists;

- information received from SCA's customers;

- legal opinions from SCA's attorneys;

60.   As a direct and proximate result of Miller's unauthorized misappropriation and use of SCA's trade secrets, SCA has suffered and will continue to suffer irreparable harm and economic damages.

61.   SCA is entitled to an injunction for actual and threatened misappropriation pursuant to A.R.S. § 44-402.

62.   SCA is entitled to compensation for all actual damages and unjust enrichment pursuant to A.R.S. § 44-403(A).

63.   SCA is entitled to its reasonable attorneys' fees pursuant to A.R.S. § 44-404(3).

1    64.    SCA is entitled to exemplary damages pursuant to A.R.S. § 44-403(B)

2  because Miller's misappropriation and wrongful use of SCA's trade secrets was willful

3  and malicious.

4                                         **COUNT SIX**

5              **(Common Law Misappropriation of Confidential Information)**

6    65.    Plaintiff incorporates by reference all of the preceding paragraphs as though

7  fully restated herein.

8    66.    In addition to its rights in its trade secrets, SCA has rights in other

9  confidential information.

10   67.    Miller improperly divulged confidential information about SCA and its

11  clients to third parties.  The confidential information that Miller divulged does not rise to

12  the level of trade secret information.

13   68.    Miller's actions described herein violated SCA's common law rights and

14  constitute misappropriation of confidential information.

15   69.    Miller committed these acts of misappropriation of confidential information

16  willfully, maliciously, and in conscious disregard of SCA's rights, with the intent to injure

17  SCA.

18   70.    As a direct and proximate result of Miller's actions, SCA has suffered

19  irreparable harm and economic damage.

20   WHEREFORE, Plaintiff requests that judgment be entered against the Defendants,

21  and each of them, as follows:

22   A.    For compensatory, consequential, exemplary, and punitive damages in an

23  amount to be determined at trial, but which exceeds $50,000.00;

24   B.    For pre- and post-judgment interest on the foregoing sum at the highest

25  lawful rate from entry of judgment until paid in full;

26   C.    For Plaintiff's costs, including attorneys' fees, incurred herein pursuant to

1    A.R.S. § 12-341;

2          D.      For all other relief the Court deems appropriate.

3

4          RESPECTFULLY SUBMITTED this 4th day of April, 2017.

5                                            SNELL & WILMER L.L.P.

6

7                                      By

8                                            Joseph G. Adams
                                             Carlie Tovrea
                                             One Arizona Center
9                                            400 E. Van Buren, Suite 1900
                                             Phoenix, Arizona 85004-2202
10                                           Attorneys for Plaintiff

11

12
     4829-9582-7782
13

14

15

16

17

18

19

20

21

22

23

24

25

26

                                        -11-

# EXHIBIT 1

# SCOTTSDALE CAPITAL ADVISORS
### Member FINRA & SIPC

### EMPLOYEE NONDISCLOSURE & COMPUTER USE AGREEMENT

This agreement (the "Agreement") is entered into by Scottsdale Capital Advisors Corp. ("Company") and _Eric miller_ ("Employee").

In consideration of the commencement of Employee's employment with Company and the compensation that will be paid, Employee and Company agree as follows:

**1.   Company's Trade Secrets**

In the performance of Employee's job duties with Company, Employee will be exposed to Company's Confidential Information. "Confidential Information" means information or material that is commercially valuable to Company and not generally known or readily ascertainable in the industry. This includes, but is not limited to:

(a)  technical information concerning Company's products and services, including product know-how, formulas, designs, devices, diagrams, software code, test results, processes, inventions, research projects and product development, technical memoranda and correspondence;

(b)  information concerning Company's business, including cost information, profits, sales information, accounting and unpublished financial information, business plans, markets and marketing methods, customer lists and customer information, purchasing techniques, supplier lists and supplier information and advertising strategies;

(c)  information concerning Company's employees, including salaries, strengths, weaknesses and skills;

(d)  information submitted by Company's customers, suppliers, employees, consultants or co-venture partners with Company for study, evaluation or use; and

(e)  any other information not generally known to the public which, if misused or disclosed, could reasonably be expected to adversely affect Company's business.

**2.   Nondisclosure of Trade Secrets**

Employee shall keep Company's Confidential Information, whether or not prepared or developed by Employee, in the strictest confidence. Employee will not disclose such information to anyone outside Company without Company's prior written consent. Nor will Employee make use of any Confidential Information for Employee's own purposes or the benefit of anyone other than Company.

However, Employee shall have no obligation to treat as confidential any information which:

(a)  was in Employee's possession or known to Employee, without an obligation to keep it confidential, before such information was disclosed to Employee by Company;

(b)  is or becomes public knowledge through a source other than Employee and through no fault of Employee; or

(c)  is or becomes lawfully available to Employee from a source other than Company.

**3.   Confidential Information of Others**

Employee will not disclose to Company, use in Company's business, or cause Company to use, any trade secret of others.

**4.   Return of Materials**

When Employee's employment with Company ends, for whatever reason, Employee will promptly deliver to Company all originals and copies of all documents, records, software programs, media and

(sca05-2009)

1/27/2012

other materials containing any Confidential Information. Employee will also return to Company all equipment, files, software programs and other personal property belonging to Company.

**5.   Confidentiality Obligation Survives Employment**

Employee's obligation to maintain the confidentiality and security of Confidential Information remains even after Employee's employment with Company ends and continues for so long as such Confidential Information remains a trade secret.

**6.   Computer Access and Use**

As part of Employee's duties, Employee will have access to Company's Electronic Communication Systems (ECS), which includes without limitation, its computers, network systems, Internet connection, Intranet, electronic mail, voicemail, facsimiles, telephones and other information systems used for the transmission of electronic communications.  As a condition of employment, Employee agrees to the following restrictions on the access and use of Company's ESS:

(a) Any access and use of ESS is strictly limited for purposes relating to Employee's duties and responsibilities as an employee, official business within Company and other activities approved in writing (including e-mail approval) by Company.

(b) All information or messages that are created, sent, received or stored using Company's ESS remain the property of Company. Company has the absolute right to monitor and log all aspects of its ESS.  Employee understands and agrees that electronic communications are neither private nor secure.

(c) Employee is the sole person authorized to use the computer account(s) issued to him/her by Company, and Employee will not share his/her password(s) with anyone.  If Employee suspects that someone else knows his/her password(s), Employee will notify his/her supervisor immediately.

(d) Employee will only access those computing resources that he/she has authorization from Company to use and will only use such resource in carrying out his/her job duties.

(e) Employee is responsible for all computing activities that occur under his/her personal computer account(s).  If Employee suspects or knows that activities by any individual or entity are in violation of this agreement, Employee agrees to immediately report it to his/her supervisor.

(f) Prohibited actions using Company's ECS include, but are not limited to the following: (1) entering data under another person's computer account or permitting another to enter data under his/her account; (2) helping an unauthorized person gain access to a Company computer or information asset; (3) accessing personal Internet email accounts (e.g., Hotmail, Yahoo, AOL, etc.); (4) sending or displaying materials that are sexually explicit, threatening, discriminatory, harassing, illegal or otherwise inappropriate; (5) using the system for illegal or criminal activities, commercial ventures, private profit, religious or political causes, any form of solicitation (except those approved by Company); (6)sending or receiving documents in violation of copyright laws; (7) transmitting confidential patient, business or risk management information to any non-Company email address; (8) attaching unauthorized devices to Company's computer network; and (9) attempting to gain access to an unauthorized area of any computing system or disabling it in any way.

**7.   General Provisions**

(a)  <u>Relationships</u>: Nothing contained in this Agreement shall be deemed to make Employee a partner or joint venturer of Company for any purpose.

(b)  <u>Severability</u>: If a court finds any provision of this Agreement invalid or unenforceable, the remainder of this Agreement shall be interpreted so as best to effect the intent of Company and Employee.

(c)  <u>Integration</u>: This Agreement expresses the complete understanding of the parties with respect to the subject matter and supersedes all prior proposals, agreements, representations and

1/27/2012

understandings. This Agreement may not be amended except in a writing signed by both Company and Employee.

(d) Waiver: The failure to exercise any right provided in this Agreement shall not be a waiver of prior or subsequent rights.

(e) Injunctive Relief: Any misappropriation of any of the Confidential Information in violation of this Agreement may cause Company irreparable harm, the amount of which may be difficult to ascertain, and therefore Employee agrees that Company shall have the right to apply to a court of competent jurisdiction for an order enjoining any such further misappropriation and for such other relief as Company deems appropriate. This right is to be in addition to the remedies otherwise available to Company.

(f) Indemnity: Employee agrees to indemnify Company against any and all losses, damages, claims or expenses incurred or suffered by Company as a result of Employee's breach of this Agreement.

(g) Attorney Fees and Expenses: In a dispute arising out of or related to this Agreement, the prevailing party shall have the right to collect from the other party its reasonable attorney fees and costs and necessary expenditures.

(h) Governing Law. This Agreement shall be governed in accordance with the laws of the State of Arizona.

(i) Jurisdiction. Employee consents to the exclusive jurisdiction and venue of the federal and state courts located in Maricopa County, Arizona in any action arising out of or relating to this Agreement. Employee waives any other venue to which Employee might be entitled by domicile or otherwise.

(j) Successors & Assigns. This Agreement shall bind each party's heirs, successors and assigns. Company may assign this Agreement to any party at any time. Employee shall not assign any of his or her rights or obligations under this Agreement without Company's prior written consent. Any assignment or transfer in violation of this section shall be void.

**8. Signatures**

Employee has carefully read all of this Agreement and agrees that all of the restrictions set forth are fair and reasonably required to protect Company's interests. Employee has received a copy of this Agreement as signed by Employee.

Employee:

_____ (Signature)

_____ (Typed or Printed Name)

Date: _____

1/27/2012

# EXHIBIT 2

# SCOTTSDALE CAPITAL ADVISORS
### Member FINRA & SIPC

## EMPLOYEE NONDISCLOSURE & COMPUTER USE AGREEMENT

This agreement (the "Agreement") is entered into by Scottsdale Capital Advisors Corp. ("Company") and _Eric miller_ ("Employee").

In consideration of the commencement of Employee's employment with Company and the compensation that will be paid, Employee and Company agree as follows:

### 1.   Company's Trade Secrets

In the performance of Employee's job duties with Company, Employee will be exposed to Company's Confidential Information. "Confidential Information" means information or material that is commercially valuable to Company and not generally known or readily ascertainable in the industry. This includes, but is not limited to:

(a)  technical information concerning Company's products and services, including product know-how, formulas, designs, devices, diagrams, software code, test results, processes, inventions, research projects and product development, technical memoranda and correspondence;

(b)  information concerning Company's business, including cost information, profits, sales information, accounting and unpublished financial information, business plans, markets and marketing methods, customer lists and customer information, purchasing techniques, supplier lists and supplier information and advertising strategies;

(c)  information concerning Company's employees, including salaries, strengths, weaknesses and skills;

(d)  information submitted by Company's customers, suppliers, employees, consultants or co-venture partners with Company for study, evaluation or use; and

(e)  any other information not generally known to the public which, if misused or disclosed, could reasonably be expected to adversely affect Company's business.

### 2.   Nondisclosure of Trade Secrets

Employee shall keep Company's Confidential Information, whether or not prepared or developed by Employee, in the strictest confidence. Employee will not disclose such information to anyone outside Company without Company's prior written consent. Nor will Employee make use of any Confidential Information for Employee's own purposes or the benefit of anyone other than Company.

However, Employee shall have no obligation to treat as confidential any information which:

(a)  was in Employee's possession or known to Employee, without an obligation to keep it confidential, before such information was disclosed to Employee by Company;

(b)  is or becomes public knowledge through a source other than Employee and through no fault of Employee; or

(c)  is or becomes lawfully available to Employee from a source other than Company.

### 3.   Confidential Information of Others

Employee will not disclose to Company, use in Company's business, or cause Company to use, any trade secret of others.

### 4.   Return of Materials

When Employee's employment with Company ends, for whatever reason, Employee will promptly deliver to Company all originals and copies of all documents, records, software programs, media and

(sca: 05-2009)

other materials containing any Confidential Information. Employee will also return to Company all equipment, files, software programs and other personal property belonging to Company.

**5. Confidentiality Obligation *Survives* Employment**

Employee's obligation to maintain the confidentiality and security of Confidential Information remains even after Employee's employment with Company ends and continues for so long as such Confidential Information remains a trade secret.

**6. Computer Access and Use**

As part of Employee's duties, Employee will have access to Company's Electronic Communication Systems (ECS), which includes without limitation, its computers, network systems, Internet connection, Intranet, electronic mail, voicemail, facsimiles, telephones and other information systems used for the transmission of electronic communications. As a condition of employment, Employee agrees to the following restrictions on the access and use of Company's ESS:

(a) Any access and use of ESS is strictly limited for purposes relating to Employee's duties and responsibilities as an employee, official business within Company and other activities approved in writing (including e-mail approval) by Company.

(b) All information or messages that are created, sent, received or stored using Company's ESS remain the property of Company. Company has the absolute right to monitor and log all aspects of its ESS. Employee understands and agrees that electronic communications are neither private nor secure.

(c) Employee is the sole person authorized to use the computer account(s) issued to him/her by Company, and Employee will not share his/her password(s) with anyone. If Employee suspects that someone else knows his/her password(s), Employee will notify his/her supervisor immediately.

(d) Employee will only access those computing resources that he/she has authorization from Company to use and will only use such resource in carrying out his/her job duties.

(e) Employee is responsible for all computing activities that occur under his/her personal computer account(s). If Employee suspects or knows that activities by any individual or entity are in violation of this agreement, Employee agrees to immediately report it to his/her supervisor.

(f) Prohibited actions using Company's ECS include, but are not limited to the following: (1) entering data under another person's computer account or permitting another to enter data under his/her account; (2) helping an unauthorized person gain access to a Company computer or information asset; (3) accessing personal Internet email accounts (e.g., Hotmail, Yahoo, AOL, etc.); (4) sending or displaying materials that are sexually explicit, threatening, discriminatory, harassing, illegal or otherwise inappropriate; (5) using the system for illegal or criminal activities, commercial ventures, private profit, religious or political causes, any form of solicitation (except those approved by Company); (6)sending or receiving documents in violation of copyright laws; (7) transmitting confidential patient, business or risk management information to any non-Company email address; (8) attaching unauthorized devices to Company's computer network; and (9) attempting to gain access to an unauthorized area of any computing system or disabling it in any way.

**7. General Provisions**

(a) Relationships: Nothing contained in this Agreement shall be deemed to make Employee a partner or joint venturer of Company for any purpose.

(b) Severability: If a court finds any provision of this Agreement invalid or unenforceable, the remainder of this Agreement shall be interpreted so as best to effect the intent of Company and Employee.

(c) Integration: This Agreement expresses the complete understanding of the parties with respect to the subject matter and supersedes all prior proposals, agreements, representations and

understandings. This Agreement may not be amended except in a writing signed by both Company and Employee.

(d) Waiver: The failure to exercise any right provided in this Agreement shall not be a waiver of prior or subsequent rights.

(e) Injunctive Relief: Any misappropriation of any of the Confidential Information in violation of this Agreement may cause Company irreparable harm, the amount of which may be difficult to ascertain, and therefore Employee agrees that Company shall have the right to apply to a court of competent jurisdiction for an order enjoining any such further misappropriation and for such other relief as Company deems appropriate. This right is to be in addition to the remedies otherwise available to Company.

(f) Indemnity: Employee agrees to indemnify Company against any and all losses, damages, claims or expenses incurred or suffered by Company as a result of Employee's breach of this Agreement.

(g) Attorney Fees and Expenses: In a dispute arising out of or related to this Agreement, the prevailing party shall have the right to collect from the other party its reasonable attorney fees and costs and necessary expenditures.

(h) Governing Law. This Agreement shall be governed in accordance with the laws of the State of Arizona.

(i) Jurisdiction. Employee consents to the exclusive jurisdiction and venue of the federal and state courts located in Maricopa County, Arizona in any action arising out of or relating to this Agreement. Employee waives any other venue to which Employee might be entitled by domicile or otherwise.

(j) Successors & Assigns. This Agreement shall bind each party's heirs, successors and assigns. Company may assign this Agreement to any party at any time. Employee shall not assign any of his or her rights or obligations under this Agreement without Company's prior written consent. Any assignment or transfer in violation of this section shall be void.

**8. Signatures**

Employee has carefully read all of this Agreement and agrees that all of the restrictions set forth are fair and reasonably required to protect Company's interests. Employee has received a copy of this Agreement as signed by Employee.

Employee:

_____ (Signature)

Eric miller (Typed or Printed Name)

Date: 5 + 10 5/15

Page 3 of 3

# EXHIBIT 3

# SCOTTSDALE CAPITAL ADVISORS
Member FINRA & SIPC

7170 E. McDonald Road, Suite 6, Scottsdale, AZ 85253

## REGISTERED REPRESENTATIVE AGREEMENT
### (Independent Contractor)

This Registered Representative Agreement for Independent Contractors ("Agreement") is made and entered into on _____ by and between Scottsdale Capital Advisors Corp (the "Company" or "SCA") and _Eric Miller_ (the "Representative").

## RECITALS

Company is a registered securities broker dealer that offers securities and other investment products and services (the "Products") to retail and institutional clients. Representative is a qualified, experienced and duly licensed registered representative.

NOW THEREFORE, for good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, the Company hereby appoints Representative as its registered representative to solicit, offer and sell Products for which the Company may act as broker, dealer, or underwriter, and Representative, hereby accepts said appointment subject to the following terms and considerations:

1. Duties. Representative agrees to become registered with Company through the Financial Industry Regulatory Authority ("FINRA") and in each State jurisdiction where Representative offers and sells securities and use his/her best efforts to offer and sell Products on behalf of Company. Representative shall at all times comply with and conform to all applicable laws, rules, regulations, and reporting requirements regarding the sale of securities, including, but not limited to, those relating to the following: FINRA, the New York Stock Exchange, Inc., the Securities and Exchange Commission, all applicable national and regional stock exchanges, the state or states where Representative is registered, and all procedures of any clearing broker with which Company may become associated at any time during the term of this Agreement (the "Regulations"). Representative agrees to strictly adhere to all policies and procedures established by Company for the conduct of its registered representatives and licensed insurance agents as may be amended from time to time, including, without limitation, Scottsdale Capital Advisors' Firm Rules & Procedures (the "Firm Procedures"). Representative shall maintain all individual insurance and securities licenses required for the sale of Products and only open accounts or solicit business in States where both Company and Representative are registered.

2. Relationship.

   a) Nothing herein shall be construed to create the relation of employer and employee between the Company and Representative. Representative shall be free to exercise his own judgment as to those persons from whom he will solicit applications and orders, the method of solicitation and the time and place of solicitation; provided, however, that in such activities Representative shall conform to applicable Firm Procedures and the Regulations then in effect. Representative will not be eligible to participate in any benefits made available by the Company to employees and the Company will not withhold any deductions for Social Security, income taxes, unemployment, or other taxes. Representative shall be responsible for all of his self-employment taxes and all other related governmental obligations, including all local fees and taxes incidental to doing business as a Registered Representative and/or insurance agent, as applicable.

Confidential

3. <u>Expenses</u>. Representative, as an independent contractor, shall promptly pay all expenses relating to the performance of his duties hereunder, including but not limited to, financial planning charges, office rentals, transportation costs, costs of office equipment and facilities, advertising expenses, long distance telephone toll and other communication charges, cost of stationary and business cards, license registration fees, errors and omission liability coverage premium, bonding fees and any national or regional securities exchange fees where applicable, subject to any prior written agreement between Representative, Company and any third party.

4. <u>Employees</u>. Representative agrees that any person or persons, whom Representative shall employ to assist Representative in the performance of his duties, hereunder shall be the employee of Representative and shall not be an employee or agent of Company. Representative agrees that he will comply with all Federal and applicable state laws relating to the employment of labor and including but not limited to, compliance with provisions of the Internal Revenue Code relating to payroll taxes and compliance with applicable state laws relating to workman's compensation. Representative shall take such steps as are necessary and appropriate to ensure that none of such persons misconceive his or her relationship with Company.

5. <u>No Binding Authority</u>. Representative shall have no authority to bind the Company by any statement, promise, representation, agreement or contract of any kind, or to waive any of Company's right or to obligate the Company in any way unless specifically authorized to do so by Company in writing. This Agreement is one for the services of Representative who shall not be entitled to assign or delegate to any other person the authority and obligations assumed or any rights, claims, or interests granted or arising hereunder.

6. <u>Commissions; Refunds; Advances; and Liens</u>.

a) The Company shall pay Representative commissions in accordance with the Representative's Offer letter and the related "Payout Schedule." Representative understands and agrees that the compensation paid under the Payout Schedule represents an advance against commissions payable. The receipt of commissions is subject to the following conditions precedent (the "Conditions"): (i) the offer and sale of the related investment transaction is made in accordance and compliance with the Regulations and Firm Procedures; (ii) all events or actions establishing the right of the Company to receive payment of commissions with respect to the subject transaction have occurred; (iii) the Company receives payment from the customer and product provider, such as the issuer, the clearing broker, the mutual fund issuer, or the insurance carrier (each a "Product Provider"), as applicable, for the related transaction[1]; and (iv) the Product Provider does not reject, cancel, reverse or chargeback against Company for any reason the commission within one year of receipt by Company. Company shall have the right to recover against future commissions payable, any commission advance to which an unsatisfied Condition relates, any overpayments, payments made in error, unpaid company advances or loans, the value of any unreturned Company property, or any losses and expenses attributable to the Company exercising its refund rights as set forth in sub-subsection (b) below, to the extent permitted by law. The Company may from time to time in its sole discretion and without notice, increase or decrease rates and amounts of commissions and

---

[1] If such payment is not delivered in US Dollars such shall not be considered payment until such is converted into US Dollars. The net Dollar amount shall then constitute the gross payment less any adjustment applicable.

Confidential

make any other changes in the Payout Schedule due to material changes in the costs and/or risks associated with the business mix conducted by Representative or Company; provided however, no such change shall be made retroactive.

b)   Company reserves the right, in its sole discretion, to refund any purchaser all or any part of payments made by him, and Representative agrees to reimburse the Company promptly for its expenses in connection therewith. Representative also agrees to repay promptly to Company all commissions received by him with respect to any such refunded payments, and the Company is hereby authorized to deduct from any commissions due or that may become due to Representative hereunder the amount owed for any such repayment of commissions and expenses.

c)   Any and all monies which may be advanced by Company or Representative over and above the commissions actually due and payable by Company to Representative hereunder at the time of such advances shall constitute personal loans from Company to Representative and shall be due and payable 10 days from the date of demand bearing interest at a rate of 12% from the date of demand until paid in full. After termination of this Agreement, for any reason whatsoever, any such loan then outstanding shall automatically and immediately become due and payable, and if not then bearing interest pursuant to the provisions of the preceding sentence shall bear interest at the maximum legal rate from the date of termination until date of repayment. If any such loan is not paid in full or if no agreement has been reached between Representative and Company within thirty (30) days after termination, Representative shall pay, as liquidated damages, in addition to the interest, an amount equal to the maximum rate of interest calculated retroactively from the date such loan first become outstanding until it is paid in full. Representative agrees to pay all costs of collection of any indebtedness created hereunder including all reasonable attorney fees and court costs.

d)   The Company shall have a lien on all securities or investments owned by Representative which are in Company's possession to secure repayment of any aforesaid loans, unearned advances or any other sums or claims due the Company from Representative and in the event such loans, unearned advances, sums or claims are not paid when due, the Company shall be entitled, without further notice to Representative, to sell or dispose of any such securities or investments on such terms and conditions as the Company, it its sole discretion determines to be the best then available, use of the net proceeds therefrom to satisfy payment of such owed sums, claims, loans and all interest accrued thereon, and remit the remaining proceeds, if any, to Representative; provided however, Representative shall remain personally liable for the excess of any such owed loans, unearned advances, sums, or claims over such net proceeds. In addition, Company is granted a lien on all commissions now or thereafter due to Representative, such lien to secure repayment on any such advances made by Company to Representative and any and all sums now or hereafter due the Company from the Representative, and for any other claims by Company against him, now existing or hereafter arising. For the purpose of such lien, Representative hereby assigns all such commissions to the Company. The Company shall be entitled to apply all such commissions toward the reduction of such advances, sums or claims until the same have been satisfied in full. These liens and this assignment shall survive the termination of this Agreement.

7.   Termination.   Unless otherwise agreed upon in writing by Company, this Agreement may be terminated by either party without cause at any time with 10 days prior written notice. Company may terminate this agreement immediately for "cause" in the event Representative: (i) is

Confidential

declared a bankrupt, makes an assignment for the benefit of creditors, or has a receiver or trustee appointed for his property; (ii) fails to comply with any of the terms, conditions and obligations of this Agreement; (iii), conducts himself in any manner which the Company, in its unrestricted discretion, determines to be detrimental to its business or reputation; or (iv) in any way acquires, obtains, or engages in any interest, affiliation or employment relating to the solicitation of the purchase or sale of securities or investments, either direct or indirect, without the prior written consent of Company.

8.   Indemnification.   Representative shall indemnify and hold harmless the Company and its officers, members, managers, employees, agents, contractors, sublicensees, affiliates, subsidiaries, successors and assigns from and against any and all damages, liabilities, costs, expenses, claims and/or judgments, including, without limitation, reasonable attorneys' fees and disbursements (collectively the "Claims") which any of them may suffer from or incur and which arise or result primarily from (i) any gross negligence or willful misconduct of Representative arising from or connected with Representative carrying out any of his/ her duties under this Agreement, (ii) or (ii) the breach by Representative of any of his/her obligations, agreements or duties under this Agreement.

9.   Confidentiality.   Company has developed confidential personal and professional relationships with individuals and firms with respect to the business in which it is engaged. In order to protect the security of Confidential Information (as hereafter defined) and to avoid the misappropriation, dissemination or unauthorized use thereof, Representative agrees that during the term of his/her association and thereafter, except in the performance of Representative's duties for Company, Representative will not directly or indirectly use or disclose, or permit the use or disclosure of, such Confidential Information without the express written consent of Company.   As used in this Agreement, the term "Confidential Information" means all information including, but not limited to, technical or non-technical data; formulas; computer programs; devices; methods; techniques; drawings; processes; financial data; personnel data; client specific information (e.g., customer or prospect names and addresses, customer account information, customer financial information, etc.); incentive or other compensation plans; production and sales information; supplier specific information; cost information; marketing plans and strategies; and "Trade Secrets" under the Uniform Trade Secrets Act or other state or federal law which is (i) disclosed to, discovered or made known to Representative as a consequence of or through his/her association hereunder with Company and (ii) not generally known to persons, corporations, organizations or others outside of the Company.

10. Conflicts.   For and during the term of Representative's engagement and in order to protect Company's Confidential Information, Representative shall not, directly or indirectly, as a consultant, agent, registered representative, officer or in any other capacity, engage or participate in, or assist any other person with respect to, any business that is in competition in any manner whatsoever with the business of Company.

11. Restrictive Covenants.

   a)   Except as otherwise may be agreed upon in writing between Company and Representative, in the event Representative's engagement hereunder is terminated by either party, and regardless of the cause of or lack of cause for such termination, and in order to protect Company's Trade Secrets and Confidential Information and Company's clients' private and confidential information, Representative agrees: for a

Independent Contractor Agreement                                                    Page 4 of 6
(sca:10-2008.1)

Confidential

period of 2 years commencing on the date of the termination of Representative's association with Company, Representative will not on behalf of himself/herself or any other person or other business enterprise, directly or indirectly, (A) solicit or attempt to solicit, or assist any other person or other business enterprise in the solicitation of or attempt to solicit, any customer or prospect of Company (a "Company Account") with respect to which Representative had contact with or learned of at any time during the twelve months preceding the termination of Representative's association; (B) accept, service or receive any commission or other payment attributable to any Company Account; or (C) disrupt or seek to disrupt, in any manner, any contractual relationship then existing between Company and any Company Account. Notwithstanding the foregoing, if Representative becomes employed elsewhere in the financial services or insurance industries, nothing contained in this Agreement shall preclude Representative from soliciting customers who were Representative's customers prior to the time that Representative became associated with Company; provided that a written list of such customers is provided to Company not later than ten (10) days after this Agreement is signed by Representative.  If Representative does not provide such written list within the ten (10) day period, Representative shall be prohibited from soliciting any customers that otherwise would have been included on the list.

b)  Representative agrees that during his/her association with Company and for 12 months thereafter, Representative will not, either directly or indirectly (whether personally or through another business entity or person), without the express written permission of Company, recruit, solicit, or induce, or encourage others to recruit, solicit or induce, any employee or person registered or associated with Company to terminate his/her employment or such association, as applicable, or otherwise cease his/her relationship with, Company.

12. <u>Remedies</u>.  Company and Representative agree that the remedy at law for any breach of Sections 9, 10 or 11 will be inadequate and that, in addition to any other remedies Company may have available to it under law, Company shall be entitled to temporary and permanent injunctive relief.  Representative shall pay all costs and expenses, including without limitation, court costs, investigation costs, expert witness fees, and attorneys' fees, incurred by the Company in connection with the successful enforcement by the Company of its rights under this Agreement.

13. <u>Miscellaneous</u>.
a)  This Agreement shall not be assigned, delegated or transferred without the prior written consent of Company.  The terms may not be changed except in writing duly signed by the Company and the Representative.

b)  This Agreement shall be governed by and construed in accordance with the laws of the State of Arizona. If any of the provisions of this Agreement are held unlawful, void or unenforceable, such event shall not affect the enforceability of the remaining provisions.

c)  This Agreement shall be executed in one original part of which each copy shall be deemed an original.

(Remainder of Page Intentionally Left Blank)

Confidential

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day, month and year first above written.

REPRESENTATIVE

By signing the below, the undersigned Representative further agrees he/she has read and understands the Firm's Policies and Procedures.

Signature _____

Print Name  *Eric Miller*  _____

SCOTTSDALE CAPITAL ADVISORS CORP

_____

John Hurry, President